IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA

*FILED*

*JUN 19 2007*

*WILLIAM B. GUTHRIE*
*Clerk, U.S. District Court*
*By _____*
*Deputy Clerk*

| | | |
|---|---|---|
| IMTEC CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. **CIV** 0 7 - 1 8 1 - J H P |
| | ) | |
| TODD E. SHATKIN and SAMUEL SHATKIN, | ) | |
| individually and doing business as | ) | |
| Samuel Shatkin, FIRST, LLC | ) | |
| | ) | |
| Defendants. | ) | |

### COMPLAINT FOR DAMAGES,
### DECLARATORY JUDGMENT AND OTHER EQUITABLE RELIEF

The Plaintiff, IMTEC Corporation, an Oklahoma corporation ("IMTEC"), for its

Complaint against the Defendants, Todd E. Shatkin and Samuel Shatkin, individually and doing

business as Samuel Shatkin FIRST, LLC, alleges and states the following:

### I.  PARTIES

1.      IMTEC is an Oklahoma corporation with its principal place of business in

Ardmore, Oklahoma.  IMTEC is engaged in the business of designing, manufacturing and

marketing tooth implants to the dental industry throughout the United States.

2.      The Defendant Todd E. Shatkin ("Shatkin") is an individual residing in the state

of New York.  The Defendant Shatkin is a dentist and practices dentistry in Erie County, New

York.

3.      The Defendant Samuel Shatkin is an individual residing in the state of New York.

The Defendant Samuel Shatkin is a practicing dentist and oral surgeon in Erie County, New

York.

1

*Consent given*

4.     Upon information and belief, Shatkin and Samuel Shatkin are doing business in Erie County, New York, as Samuel Shatkin FIRST, LLC.

## II.  JURISDICTION

5.     Plaintiff is a resident and citizen of the state of Oklahoma; Defendants are residents in and are citizens of the state of New York.  This action is therefore one between citizens of different states.

6.     The amount in controversy, exclusive of interest and costs, exceeds $75,000.00. Therefore, pursuant to 28 U.S.C. § 1332, this Court has subject matter jurisdiction.  Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the asserted claims occurred in this district.

7.     This Court has personal jurisdiction over each party by virtue of each party's contacts with the state of Oklahoma.

## III.  FACTUAL BACKGROUND

8.     IMTEC designs, develops, manufactures and markets a complete range of high quality dental specialty products for the global dental market. IMTEC's array of dental products includes high quality root form endosseous dental implants, proprietary, pure Polytetrafluorethylene (PTFE) membranes, resorbable membranes and tacks, Sendax MDI mini-dental implants, tissue and bone regeneration systems, surgical drills and instrumentation, and an extensive line of other dental prosthetics and laboratory components. IMTEC's Sendax MDI mini-dental implant system is accepted by the FDA for long-term applications, the first mini-implant on the market with that critical distinction.

9.     In the summer of 2003, Shatkin, a practicing dentist from the state of New York, solicited IMTEC to become a partner in a new business that Shatkin promised would

2

"revolutionize" dental implant surgery. Shatkin promised and represented to IMTEC that Shatkin had applied for a patent for a technology that he had developed that would allow a dentist to replace missing teeth with implant supported cemented and/or removable restorations in as little as one visit, without the complications of major oral surgery and long healing times. . According to Shatkin, the procedure involved the use of a miniature titanium implant, or a "stent," that acts like the root of a tooth and a retaining fixture that is incorporated into the base of the denture.

10.     IMTEC was intrigued by the concept. IMTEC's then-current business plan marketed IMTEC's products and services to dental patients who required multi-tooth replacement and/or multi-crown-bridge applications. The partnership contemplated by Shatkin provided IMTEC with an opportunity to market IMTEC's Sendax MDI (Mini-Dental Implant) denture stabilization offerings to dentists whose patients required a single tooth and crown/bridge dental application. As proposed by Shatkin, the business model of the new company would require that IMTEC's MDI implants be the core product for the new company offerings. IMTEC determined that IMTEC could possibly assist in marketing the new business through IMTEC's database of over 15,000 general dentists and specialists in the United States and on-line promotions.

11.     IMTEC accepted the proposal, and based on the representations of Shatkin that his unique, specialized and soon to be patented protocol could facilitate the distribution of IMTEC's products throughout the industry, entered into that certain "LICENSING/MARKETING AGREEMENT" dated September 11, 2003 ("the Licensing Agreement") between IMTEC, Shatkin and Andrew Jakson, d/b/a Dental Tech Laboratories LLC ("Jakson"). Jakson owned the laboratory which Shatkin recommended should provide dental

3

hardware and other apparatus for the concept.   A copy of the Licensing Agreement is attached as Exhibit 1.

12.     As set forth in the Licensing Agreement, the parties adopted a business plan whereby Shatkin, Jakson and IMTEC would form an operating entity through which the parties' business would be conducted and in which the parties' collective proprietary data would be held. The entity, to be known and named as F.I.R.S.T. Laboratories, LLC ("F.I.R.S.T."), would be owned by Shatkin, Jakson and IMTEC in equal shares.

13.     Importantly, and as stated in the Licensing Agreement, Shatkin was required to grant an exclusive license of the contemplated patent and technology to F.I.R.S.T. in order for the company's business to have an asset that could not be pirated and would enable the business to promote itself as a full-service, national dental lab that provided case planning and consultation with dentists, and the fabrication of crowns, dentures and bridges.

14.     The Licensing Agreement provides that the term of the Agreement shall begin on September 16, 2003, and continue thereafter so long as IMTEC continued to promote and market "certain intellectual properties" granted in an exclusive license to F.I.R.S.T. by Shatkin.  IMTEC was entitled to use its discretion in marketing these intellectual properties.

15.     The Licensing Agreement also provides and requires Shatkin to cooperate fully with IMTEC to develop and market the F.I.R.S.T. product and furnish IMTEC with customer databases, referrals and any other intellectual property, tangible item or information that would assist IMTEC in marketing the F.I.R.S.T. line of products and/or services.

16.     Further, the Licensing Agreement provided that during and after the term of the Licensing Agreement, IMTEC, Shatkin and Jakson agreed to secure, protect and keep confidential all proprietary information concerning the F.I.R.S.T. fabricated implant restoration

4

and surgical technique. For further protection, the Licensing Agreement also provided that during the term of the Agreement, Shatkin and Jakson shall not compete in any manner with IMTEC by engaging in any enterprise, directly or indirectly, in the business of manufacturing, marketing or selling fabricated implant restorations and/or surgical techniques, or a similar business to the F.I.R.S.T. fabricated implant restoration and surgical technique and protocol.

17.     Pursuant to the Licensing Agreement, and on September 16, 2003, Shatkin, Jakson and IMTEC formed F.I.R.S.T. Laboratories, LLC. In conjunction with the formation of F.I.R.S.T., the parties also executed an Operating Agreement.   The F.I.R.S.T. Operating Agreement appointed Shatkin, Jakson and James Clark of IMTEC as co-managers.   The Operating Agreement also appointed Shatkin's father, Samuel Shatkin, as the Treasurer-Manager. Thereafter, IMTEC acquiesced at Shatkin's insistence that F.I.R.S.T. conduct its business from Shatkin's facility in Erie County, New York. A copy of the F.I.R.S.T. Laboratories, LLC Operating Agreement is attached hereto and marked as Exhibit 2.

18.     The F.I.R.S.T. Operating Agreement also provides that in Article XIII.B of the Operating Agreement, the parties agree that the Licensing Agreement would be included in its "entirety." The LLC Operating Agreement also contains a choice of law provision that states "irrespective of the place of execution or performance," that the Agreement would be governed in accordance with the laws of the State of Oklahoma applicable to agreements made and to be formed in the State of Oklahoma.

19.     After formation of F.I.R.S.T., IMTEC complied with its obligations under the Licensing Agreement and actively promoted the F.I.R.S.T. business plan. Through its efforts, and the efforts of Shatkin and Jakson, F.I.R.S.T. was successful and generated hundreds of thousands of dollars of profits for its partners in the first two years of its operations. At the

annual meeting of the F.I.R.S.T. members in September 2006, Samuel Shatkin advised the members of F.I.R.S.T. that they could expect to generate sales in excess of $1.4 million. Shatkin also expected that F.I.R.S.T. sales would exceed $25 million by the year 2011.

20.    It was during this meeting, however, that IMTEC discovered that Shatkin and Samuel Shatkin's management of F.I.R.S.T. was inadequate and incomplete. .  Indeed, as the Shatkins disclosed at the meeting, F.I.R.S.T. had no accounting procedure in place and that there were no records of billings, invoices or other bookkeeping that could record the sale of F.I.R.S.T. products to its customers.

21.    It was also during this meeting that IMTEC learned that, in fact, Shatkin had successfully secured his patent application for the protocols and procedures that F.I.R.S.T. had been marketing as part of its business plan.  However, and despite the contractual obligations set forth in the Licensing Agreement that required Shatkin to assign to F.I.R.S.T. the "exclusive license" to use the technology, Shatkin refused to make such an assignment to F.I.R.S.T. despite requests that he do so.

22.    IMTEC also learned that Shatkin and Samuel Shatkin had caused F.I.R.S.T. to pay undisclosed and unauthorized "consulting fees" and purported reimbursements of expenses to both Shatkin and Samuel Shatkin. IMTEC confronted Shatkin with the unauthorized consulting fees and reimbursements, and demanded that the business be moved to Ardmore, Oklahoma where the appropriate accounting procedures could be put in place.

23.    In response, and by letter dated May 22, 2007, Shatkin wrote IMTEC and Jakson a letter that purports to constitute notice of termination of the Licensing Agreement and alleging that IMTEC and Jakson had materially breached the Agreement.   Because the F.I.R.S.T.

6

Operating Agreement provides that F.I.R.S.T. shall be terminated upon the termination of the Licensing Agreement, Shatkin claims that F.I.R.S.T. is dissolved by operation of law.

24.     Consequently, Shatkin and Samuel Shatkin have formed another company and are currently doing business as Samuel Shatkin, FIRST, LLC in Erie County, New York. Upon information and belief, IMTEC believes that this new company is owned, in equal shares, by Shatkin and Samuel Shatkin. Upon information and belief, IMTEC believes that Samuel Shatkin FIRST, LLC is conducting its business utilizing F.I.R.S.T. intellectual property, including IMTEC's database of practicing dentists throughout the country and the patented technology to which F.I.R.S.T. is entitled to an exclusive license as required by the Licensing Agreement.

## IV.   FIRST CAUSE OF ACTION
## (Breach of Contract)

25.     Paragraphs 1-24 are incorporated by reference

26.     The Licensing Agreement contains Shatkin's specific promise to cooperate fully with IMTEC in developing the business of F.I.R.S.T. and to furnish IMTEC with all intellectual property, tangible item or information that would assist IMTEC in facilitating the growth of the F.I.R.S.T. business. Shatkin has breached those promises and the terms of the Licensing Agreement by (i) refusing to provide IMTEC with an accounting of all compensation that F.I.R.S.T. has paid to Shatkin and Samuel Shatkin; (ii) unauthorized discounts taken by Shatkin in the business or paid to others, and (iii) Shatkin's wrongful attempt to terminate the Licensing Agreement and purported *de facto* dissolution of F.I.R.S.T.

27.     Shatkin has breached the Licensing Agreement by failing to assign to F.I.R.S.T. the exclusive license to use the technology for which Shatkin successfully secured a patent.

28.     As a direct and proximate result of the foregoing breaches of contract, IMTEC has been damaged in an amount exceeding $75,000.

7

## V.  SECOND CAUSE OF ACTION
### (Fraud)

29.    Paragraphs 1-28 are incorporated by reference.

30.    Shatkin's reported wrongful attempt to terminate the Licensing Agreement, and the purported *de facto* dissolution of F.I.R.S.T. is contrived and designed to defraud IMTEC. Shatkin never intended to perform his obligations under the Licensing Agreement.   In fact, IMTEC has recently learned that Shatkin secured a trademark of "F.I.R.S.T." in his name, and without advising IMTEC or the other members of F.I.R.S.T. that he had done so.

31.    Such conduct constitutes fraud and breach of fiduciary duty.  As a result, IMTEC has suffered damages exceeding $75,000.00.

32.    IMTEC also seeks damages against Samuel Shatkin as a party who conspired with Shatkin to commit the stated fraud.

33.    Shatkin and Samuel Shatkin's tortious misconduct was intentional, malicious and designed to injury IMTEC.  Therefore, IMTEC is entitled to an award of punitive damages.

## VI.  THIRD CAUSE OF ACTION
### (Breach of Duty of Good Faith and Fair Dealing)

34.    Paragraphs 1-33 are incorporated by reference.

35.    There exists in every contract an implied covenant and/or duty of good faith and fair dealing that requires each party to refrain from any conduct that would defeat the reasonable expectations of the parties.

36.    Shatkin breached this implied duty of good faith and fair dealing by his wrongful attempt to terminate the Licensing Agreement and dissolve F.I.R.S.T., and to enter a new business using F.I.R.S.T.'s intellectual property.  As a result of this breach, IMTEC has suffered damages exceeding $75,000.00 for which Shatkin is liable.

8

## VII.  FOURTH CAUSE OF ACTION
### (Declaratory Judgment)

37.     Paragraphs 1-36 are incorporated by reference.

38.     Shatkin's complaints that IMTEC failed to comply with the Licensing Agreement are contrived.  At all times, IMTEC actively promoted the business of F.I.R.S.T.   IMTEC was not required to actively promote the F.I.R.S.T. concept and technique to Shatkin's personal satisfaction.  The Licensing Agreement specifically provided that IMTEC could use its discretion in marketing the F.I.R.S.T. fabricated implant, restoration and surgical techniques and the steps it would take to blend same with IMTEC's marketing schemes.

39.     An actual controversy exists between IMTEC, on the one hand, and Shatkin and Samuel Shatkin, individually and doing business as Samuel Shatkin FIRST,  LLC, on the other, regarding the purported termination of the Licensing Agreement and *de facto* dissolution of F.I.R.S.T.  Therefore, IMTEC is entitled to a declaratory judgment declaring that Shatkin had no right to unilaterally terminate the Licensing Agreement, and that the Licensing Agreement remains in full force and effect and that F.I.R.S.T. is not dissolved by operation of law.

## VIII.  FIFTH CAUSE OF ACTION
### (Wrongful Interference with IMTEC's Business Relationships)

40.     Paragraphs 1-39 are incorporated by reference.

41.     Shatkin and Samuel Shatkin's wrongful attempt to terminate the Licensing Agreement and their attempts to do business as Samuel Shatkin FIRST, , LLC has interfered with and will continue to interfere with IMTEC's business with F.I.R.S.T.

42.     As a direct result of this interference, IMTEC will suffer damages exceeding $75,000.00.   Shatkin and Samuel Shatkin are therefore liable to IMTEC for all damages sustained by IMTEC as a direct and proximate result of the Defendants' tortious interference.

43.     Shatkin and Samuel Shatkin's tortious misconduct was intentional, malicious and designed to injury IMTEC.  Therefore, IMTEC is entitled to an award of punitive damages.

## IX.  SIXTH CAUSE OF ACTION
### (Specific Performance)

44.     Paragraphs 1-43 are incorporated by reference.

45.     The Licensing Agreement specifically provides that Shatkin will grant to F.I.R.S.T. the "exclusive license" to use Shatkin's patented technology and procedures.  Shatkin has refused IMTEC's demand to assign same to F.I.R.S.T.  The Court should therefore enter a decree of specific performance requiring Shatkin to assign to F.I.R.S.T. the exclusive right to utilize the patented technology.

## X.  SEVENTH CAUSE OF ACTION
### (Temporary and Permanent Injunction)

46.     Paragraphs 1-45 are incorporated by reference.

47.     The Licensing Agreement provides and requires Shatkin to secure, protect and keep confidential all of F.I.R.S.T.'s proprietary information, and further prohibits Shatkin from competing, in any manner, with IMTEC by engaging in any enterprise, directly or indirectly, in the business of manufacturing, marketing or selling, fabricating implant restoration and/or surgical techniques, or a similar business to the F.I.R.S.T. fabricated implant restoration and surgical technique protocol.

48.     Despite these contractual requirements and prohibitions, Shatkin and Samuel Shatkin are currently doing business under the trade name of Samuel Shatkin FIRST,  LLC, in direct competition with IMTEC and the business of F.I.R.S.T., and utilizing the proprietary and confidential information of F.I.R.S.T.

10

49.    IMTEC will suffer irreparable harm if Shatkin and Samuel Shatkin continue to do business utilizing F.I.R.S.T. products and competing with F.I.R.S.T. and/or IMTEC. Therefore, the Court should issue both temporary and permanent injunctions enjoining Shatkin and Samuel Shatkin, and/or any of its related business, from utilizing F.I.R.S.T.'s proprietary information and participating in businesses that are in competition with F.I.R.S.T. and/or IMTEC.

## XI.  PRAYER

WHEREFORE, Plaintiff prays for relief on the merits:

1.    Actual damages in an amount to be determined at trial, which amount is not ascertainable at this time;

2.    Punitive or exemplary damages in an amount to be determined at the time of trial;

3.    Prejudgment interest on any ascertainable amount;

4.    Injunctive relief as stated herein.

5.    Costs;

6.    Attorneys fees;

7.    Such other and further relief as the Court should find just and proper under the circumstances.

**JURY TRIAL DEMANDED**

Respectfully submitted,

William A. Johnson, OBA No. 4730
David Elder, OBA No. 20687
HARTZOG CONGER CASON NEVILLE,  P.C.
201 Robert S. Kerr Ave., Suite 1600
Oklahoma City, Oklahoma 73102
Telephone: (405) 235-7000
Fax: (405) 996.3403
**ATTORNEYS FOR PLAINTIFF**

11